**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
HARRIET L. BOYCE,                                       :
                                                                       :
                    Plaintiff,                                   :
                                                                       :          Civil Action No. 08-361 (JAG)
                    v.                                               :
                                                                       :                    **OPINION**
MICHAEL J. ASTRUE,                                    :
COMMISSIONER OF SOCIAL                      :
SECURITY,                                                     :
                                                                       :
                    Defendant.                                :
_____:

**GREENAWAY, JR., U.S.D.J.**

        Plaintiff, Harriet Boyce ("Plaintiff"), seeks review of the Social Security Commissioner's

("Commissioner") decision denying her application for Social Security Disability Insurance

Benefits ("SSDI"), pursuant to 42 U.S.C. § 405(g).  Plaintiff contends that the Commissioner's

conclusions and findings of fact are not supported by substantial evidence and are contrary to law

and regulation.  For the reasons set forth in this Opinion, this Court affirms the Commissioner's

final decision denying Plaintiff disability benefits.

# I. PROCEDURAL HISTORY

On June 8, 2004, Plaintiff filed an application for SSDI benefits, alleging disability since May 12, 2004.[1]  (Tr.[2] 86.)  The Social Security Administration initially denied Plaintiff's claim on July 21, 2004 (Tr. 37-39) and denied reconsideration on September 24, 2004 (Tr. 32-34). Plaintiff subsequently requested a hearing by an administrative law judge to review her application *de novo*.[3]  (Tr. 30.)  On August 6, 2007, Administrative Law Judge Francis H. Ayer ("ALJ Ayer") issued a written decision (Tr. 14-24) based upon an initial hearing held on July 31, 2006 (Tr. 279-300).  A supplemental hearing was held on June 4, 2007.  (Tr. 301-308.)  Below is a summary of his findings:

1.  "The claimant meets the insured status requirements of the Social Security Act through September 30, 2007."  (Tr. 16.)

2.  "The claimant has not engaged in substantial gainful activity since May 12, 2004, the alleged onset date (20 CFR [sic] [§§] 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et. seq.*)."  (Id.)

---

[1] According to the Administrative Law Judge's opinion, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on May 24, 2004.  (Tr. 14.)  However, the record does not include a copy of the May 24, 2004 protectively filed application.  The only other reference to this application in the record is in the disability report dated June 9, 2004, under the heading "Miscellaneous Information."  (Tr. 97.)  The earliest application in the record is dated June 8, 2004.

[2] As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  42 U.S.C. §405(g) "Tr." refers to that transcript.

[3] If the claimant "receives an adverse reconsideration determination, he is entitled to an evidentiary hearing and *de novo* review by an administrative law judge."  Heckler v. Day, 467 U.S. 104, 106 (1984).

2

3.      "The claimant has the following severe impairments: lumbar[4] disc[5] disease[6] and obesity[7] (20 CFR [sic] [§§] 404.1520(c) and 416.920(c))."  (Id.)

4.      "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR [sic] [§§] 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  (Tr. 17.)

5.      "[T]he claimant has the residual functional capacity to perform a limited range of light work activity."  (Id.)

6.      "The claimant is unable to perform any past relevant work (20 CFR [sic] [§§] 404.1565 and 416.965)."  (Tr. 22.)

7.      "The claimant was born on September 18, 1958 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR [sic] [§§]  404.1563 and 416.963)."  (Id.)

8.      "The claimant has a limited, 9th grade education and is able to communicate in English (20 CFR [sic], [§§] 404.1564 and 416.964)."  (Tr. 23.)

9.      "Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR [sic] [§§] 404.1568 and 416.968)."  (Id.)

---

[4] The lumbar region pertains to "the part of the abdomen in the middle zone on both sides of the umbilical region." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 979 (6th ed. 2002) (hereinafter "MOSBY'S").

[5] Disc refers to "a flat, circular, platelike structure, as an articular disc or an optic disc." MOSBY'S at 533.  Informally, the term disc is used to describe an "intervertebral disc."  MOSBY'S at 533.

[6] Disease is characterized as "1. a condition of abnormal vital function involving any structure, part, or system of an organism. 2. a specific illness or disorder characterized by a recognizable set of signs and symptoms, attributable to heredity, infection, diet, or environment." MOSBY'S at 533.

[7] Obesity is defined as "an abnormal increase in the proportion of fat cells, mainly in the viscera and subcutaneous tissues of the body.  Obesity may be exogenous or endogenous. Hyperplastic obesity is caused by an increase in the number of fat cells in the increased adipose tissue mass.  Hypertrophic obesity results from an increase in the size of the fat cells in the increased adipose tissue mass."  MOSBY'S at 1206.

10.     "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR [sic] [§§] 404.1560(c), 404.1566, 416.960(c), and 416.966)."  (Id.)

11.     "The claimant has not been under a disability, as defined in the Social Security Act, from May 12, 2004 through [August 6, 2007] (20 CFR [sic] [§§] 404.1520(g) and 416.920(g))."  (Tr. 24.)

Based upon these findings, ALJ Ayer concluded that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.  (Id.)  Furthermore, ALJ Ayer held that Plaintiff was not entitled to disability insurance benefits.  (Id.)  On September 24, 2007, the Social Security Administration Appeals Council affirmed ALJ Ayer's August 6, 2007 decision. (Tr. 4.)  Plaintiff then filed this action.  She is seeking review of the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g).  (Compl. ¶ 1.)

Although she is a resident of Haldon, New Jersey, Plaintiff initially filed her action with the United States District Court for the Middle District of Florida.  (Compl. ¶ 4.)  Defendant filed a motion to transfer the case to the United States District Court for the District of New Jersey on the basis of improper venue, pursuant to 28 U.S.C. § 1406(a).  (Mot. to Transfer 1.)  Following the grant of  Defendant's motion this case was assigned to this Court.

## STATEMENT OF THE FACTS

### A. Background

Plaintiff, Harriet Lee Boyce, was born on September 18, 1958. (Tr. 97.)  She stopped working on May 5, 2004.  (Id.).  She claims to be unable to work now due to a herniated disc in her back that limits her mobility at work.  (Tr. 103.)  Plaintiff has a ninth grade education (Tr.

4

283),[8] and is able to understand, speak, read, and write English (Tr. 103).  She is five feet and two inches tall and weighs 172 pounds.  (Tr. 170.)

From 1993 to 2003, Plaintiff worked concurrently as a kitchen helper (Tr. 150) at a restaurant (Tr. 104), and as a housekeeper (Tr. 150).  At both places of employment, she performed general labor (Tr. 283) such as cleaning and vacuuming (Tr. 110).  At the restaurant, Plaintiff stated that the heaviest weight she lifted was 10 pounds.  (Tr. 105.)  Yet, she simultaneously stated that she lifted 25 pounds between 1/3 and 2/3 of a workday.[9]  (Id.)  During a five day work week, Plaintiff's typical eight hour work day included seven hours of walking; seven hours of standing; .3 hours of sitting; one hour each of stooping, kneeling, and crouching; one hour each of handling, grabbing or grasping big objects; one hour of reaching; and one hour each of writing, typing or handling small objects.  (Tr. 104-5.)

As a housekeeper, Plaintiff performed different types of temporary labor (Tr. 115) at various households (Tr. 284).  The amount of lifting and carrying that she performed depended on what type of job she undertook.  (Tr. 116.)  Regardless of the type of work, Plaintiff stated that she performed general labor for eight hours a day, five days a week.  (Id.)  In doing so, she carried up to ten pounds between 1/3 to 2/3 of the workday.  (Id.)  Plaintiff currently does not work, and has not worked at any time after her lumbar condition began to first bother her.  (Tr. 104.)

---

[8] Plaintiff testified, and ALJ Ayer found, that she had a ninth grade education (Tr. 16), although disability reports show that Plaintiff had stated previously that she had an eighth grade education (Tr. 103).

[9] There is an inherent discrepancy between the heaviest weight lifted being ten pounds and Plaintiff consistently lifting twenty-five pounds.

5

**B. Claimed Disability**

Plaintiff alleges disability since May 12, 2004.  (Tr. 97.)  She claims that she injured herself by falling off a bicycle on May 5, 2004.  (Tr. 152, 286.)  As a result of the fall, Plaintiff injured her back.[10]  (Tr. 286.)  She testified that she is unable to work because she has problems standing and cannot sit for long periods of time.[11]  (Id.)  As an example, Plaintiff explained that sitting in a car for an extended period causes her pain.  (Tr. 288.)  Furthermore, she claimed that she has problems walking because her leg will "give out," causing her to fall.[12]  (Tr. 287.)

Plaintiff continued to testify that the severity of her back pain prohibits her from lying flat as she sleeps.  (Tr. 289.)  Nevertheless, Plaintiff also testified that she has back pain if she does not take hour long naps in the afternoon.  (Tr. 289-90.)  At the time of Plaintiff's initial hearing with ALJ Ayer on July 31, 2006, she was not taking any prescription medications for the pain, but rather self-medicated with Tylenol.  (Tr. 288-89.)  As a result of her pain, Plaintiff stopped working on May 12, 2004, shortly after her injury.  (Tr. 104.)

**C. Medical Evidence**

The record indicates that Plaintiff received medical attention for her alleged injury on different occasions.

---

[10] The record indicates that Plaintiff initially complained about numbness in her fingers on both hands, morning stiffness, lower back pain, and pain in her legs on September 13, 2000. (Tr. 263.)

[11] Plaintiff clarified that a long period of time was about ten to fifteen minutes.  (Tr. 286.)

[12] Plaintiff performs necessary activities such as grocery shopping with the aid of her daughter-in-law.  (Tr. 287.)  Plaintiff also steadies herself by leaning against a shopping cart while grocery shopping.  (Id.)

### 1.  Initial Examination by Manatee Memorial Hospital Emergency Room

Plaintiff was admitted to the Manatee Memorial Hospital Emergency Room on the date of her injury, May 5, 2004.  (Tr. 152.)  Although Plaintiff rated her subjective level of pain as a "ten," her case was classified as less urgent.  (Tr. 153.)  At the time that she was admitted to the hospital, Plaintiff stated that she had "such pain in [her] lower back [that she] feels like [her] legs are going to give out."  (Id.)  Contrarily, the physician's clinical report described Plaintiff's pain as "moderate."  (Tr. 155.)  Plaintiff's back showed signs of tenderness and muscle spasms, but lumbo-sacral spine x-rays were negative.  (Id.)

Plaintiff was diagnosed with a single contusion to the back, and was instructed upon discharge to apply ice intermittently.  (Tr. 156.)  The physician's instructions also stated that Plaintiff should not work on the day of the accident or the day after.  (Id.)  Plaintiff received two prescription medications,[13] and was subsequently discharged.  (Id.)  She was instructed to follow up her emergency room visit with Dr. Raul Correa, if she did not feel better in three days.[14]  (Id.)

### 2.  Dr. Steven Sweat Clinical Examination

On May 25, 2004, Plaintiff submitted to a lumbar spine x-ray and magnetic resonance imaging (MRI) study for her lower back pain.  (Tr. 164-65.)  Dr. Steven Sweat was the attending

---

[13] Plaintiff was prescribed five milligrams of Lortab.  She was to take one to two pills orally every four to six hours, as needed for pain.  She received a prescription for fifteen pills. Plaintiff was also prescribed ten milligrams of Flexeril.  She was instructed to take one pill orally every eight hours, as needed for muscle spasms.  This prescription was for twenty pills.  (Tr. 156.)

[14] There is no evidence suggesting that Plaintiff ever visited Dr. Correa.

doctor.  (Tr. 164.)  The x-ray study showed no fractures or subluxation,[15] and the sacroiliac joint[16]

appeared "unremarkable," but Plaintiff exhibited mild degenerative changes along with

osteopenia.[17]  (Id.)  The conclusion of the x-ray study was that Plaintiff suffered no acute[18]

abnormality.  (Id.)

      The MRI of the lumbar spine established that Plaintiff had narrowing and desiccation at

the T10-T11[19] disc space and a "senescent[20] Schmorl's node[21] along the inferior aspect of the

T10 vertebral body."  (Tr. 165.)  At the L2-L3[22] disc, the imaging also showed a "mild disc bulge

without significant central or foraminal[23] encroachment."  (Id.)  The report continues to state

---

[15] Subluxation, also known as an incomplete dislocation, is "a partial abnormal separation of the articular surfaces of a joint."  MOSBY'S at 883.

[16] The sacroiliac joint is "an irregular synovial joint between the sacrum and the ilium on either side."  MOSBY'S at 1528.  A synovial joint is a "freely movable joint in which contiguous bony surfaces are covered by articular cartilage and connected by a fibrous connective tissue capsule lined with synovial membrane."  MOSBY'S at 1670.

[17] Osteopenia is "a condition of subnormally mineralized bone, usually the result of a failure of the rate of bone matrix synthesis to compensate for the rate of bone lysis."  MOSBY'S at 1245.

[18] When referring to symptoms, the term acute means "beginning abruptly with marked intensity or sharpness, then subsiding after a relatively short period."  MOSBY'S at 29.

[19] T10-T11 refers to the tenth and eleventh "bony segments of the spinal column of the upper back designated T1 to T12 or D1 to D12.  T1 is just below the seventh cervical vertebra (C7), and T12 is just above the first lumbar vertebra (L1)."  MOSBY'S at 1705.

[20] Senescent means to be "aging or growing old."  MOSBY'S at 1562.

[21] A node is "a small rounded mass."  MOSBY'S at 1188.

[22] L2-L3 refers to the second and third lumbar vertebrae.  MOSBY'S at 1026.

[23] Foraminal is derived from foramen, which is "an opening or aperture in a membranous structure or bone."  MOSBY'S at 698.

that "[a]t L4-L5 there is a large disc bulge and there is significant facet hypertrophy[24] and yellow ligament[25] hypertrophy." (Id.)  As a result, Plaintiff suffers from "severe central spinal canal[26] stenosis[27]." (Id.)  Additionally, there is "added soft tissue [] in the right lateral location [of [Plaintiff's] back that] caus[ed] some mass effect on the exiting L4 nerve root on the right." (Id.) Although the report does not make a definitive finding of the cause, a disc herniation[28] could not be ruled out.  (Id.)

The images also exhibited a centrally focal soft tissue defect with an apparent tear of the annulus[29] at the L5-S1 level.  (Id.)  The reporting physician speculated that these could be signs of a small central disc herniation.  (Id.)  "There is also a disc bulge diffusely and some added soft tissue in the right neural foramen suggesting a focal lateral disc herniation [or] protrusion." (Id.) Moreover, the result is a "fairly severe neural foraminal encroachment on the right, but on the left

---

[24] Hypertrophy is "an increase in the size of an organ caused by an increase in the size of the cells rather than the number of cells."  MOSBY'S at 851.

[25] Yellow ligaments are "elastic ligaments such as ligamenta flava [that] connect certain parts of adjoining vertebrae."  MOSBY'S at 1004.

[26] The central canal of the spinal cord is "a conduit that runs the entire length of the spinal cord and contains most of the 140 mL of cerebrospinal fluid (CSF) in the body of the average individual.  The central canal of the spinal cord lies in the center of the cord between the ventral and the dorsal gray commissures and extends toward the cranium into the medulla oblongata, where it opens into the fourth ventricle of the brain."  MOSBY'S at 316.

[27] Stenosis is "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  MOSBY'S at 1630.

[28] A herniation is a "protrusion of a body organ or portion of an organ through an abnormal opening in a membrane, muscle, or other tissue."  MOSBY'S at 808.

[29] An annulus is "any ring shaped structure, such as the outer edge of an intervertebral disc."  MOSBY'S at 102.

there is only mild to moderate foraminal encroachment with mild mass effect on the exiting L5 nerve root."  (Id.).

The final conclusion of the MRI study of the lumbar spine was that "at the L4-L5 disc there is a disc bulge together with facet changes leading to severe central canal stenosis."  (Tr. 166.)  "In addition there is some concern for a right lateral disc herniation leading to compression of the L4 nerve root."  (Id.)  Moreover, "[a]t L5-S1[30] [disc] there is a disc bulge with a superimposed central disc herniation."  (Id.)  "There is only mild central canal stenosis."  (Id.)  "There is also a suggestion of a right lateral disc herniation [or] protrusion leading to significant mass effect on the exiting L5 nerve root."  (Id.)

### 3.  Examination by Richard A. Proctor, D.O

On July 15, 2004, Dr. Richard A. Proctor, a doctor of osteopathic medicine, examined Plaintiff.  (Tr. 167.)  At this examination, Plaintiff complained of pain "at her sacral area and at her buttocks."  (Id.)  She also reported that her discomfort was worse at night, and "that she feels 'stiff' when getting out of bed in the morning."  (Id.)  When examining Plaintiff's extremities, Dr. Proctor noticed "no grossly evident abnormalities of the joints."  (Tr. 168.)  Plaintiff exhibited a full and painless range of motion.  (Id.)  Her grip and upper extremities were given a score of five out of five.  (Id.)  Contrarily, "the lower extremity strength can best described as [two or three out of five]."  (Id.)  Dr. Proctor also noted that "[t]his examiner has no confidence in the honest participation by the claimant."  (Id.)

---

[30] S1 refers to the first sacral nerve in the sacral plexus. MOSBY'S at 1528.  The sacral plexus is "a network of motor and sensory nerves formed by the lumbosacral trunk from the fourth and fifth lumbar, and by the first, second, and third sacral nerves." MOSBY'S at 1528.

10

Plaintiff also underwent a musculoskeletal examination.[31]  (Id.)  This examination also revealed that the spine had a full and painless range of motion in all planes.  (Id.)  As opposed to Plaintiff's first visit to the Manatee Memorial Hospital emergency room, Dr. Proctor did not find any muscle spasms.  (Id.)  Plaintiff got on and off of the exam table "in normal fashion, with normal speed, and without discernible discomfort."  (Id.)

Dr. Proctor's final clinical impression was that Plaintiff had mild "sacroiliaciutus" [sic][32] which was "amenable to osteopathic correction."  (Id.)  He also suggested reviewing the previous MRI. (Id.)

Additionally, Dr. Proctor made a finding regarding Plaintiff's functional ability.  (Id.)  He stated that Plaintiff is "able to sustain repetitive movements of her upper and lower extremities and lift objects weighing 40 pounds or less."  (Id.)  Plaintiff also was found to have the unimpaired ability "to walk, sit, stand, jump, climb a ladder, rapidly ascend multiple flights of stairs without rest, hear, speak intelligibly, perform activities associated with memory, concentration and social interaction."  (Id.)

### 4.  Physical Residual Functional Capacity Assessment

On September 13, 2004, Dr. J.D. Perez, a state agency medical consultant, performed a physical residual functional capacity assessment.  (Tr. 177-184.)  Dr. Perez found that Plaintiff

_____

[31] A musculoskeletal examination is a systemic assessment that evaluates "the condition and functioning of the patient's muscles, joints, and bones and of factors that may contribute to abnormalities in these body structures." MOSBY'S at 1064.

[32] Sacroiliitis is "an inflamation of the sacroiliac joint." MOSBY'S 1 at 528.  The sacroiliac joint is "an irregular synovial joint between the sacrum and the ilium on either side." MOSBY'S at 1528.  This Court notes that Dr. Proctor's medical report referred to sacroiliaciitus, rather than sacroiliitis.  This Court could locate no reference to "sacroiliaciitus" and therefore concludes that this was a misspelling.

could occasionally lift or carry up to fifty pounds, and frequently lift or carry up to twenty-five pounds.  (Tr. 178.)  She could stand or walk with normal breaks for a total of about six hours in an eight hour work day.  (Id.)  Likewise, Dr. Perez found that Plaintiff was capable of sitting with normal breaks for a total of about six hours in an eight hour workday.  (Id.)  Therefore, Dr. Perez found that Plaintiff was not limited in any capacity other than the weight provisions for lifting or carrying items.  (Id.)  Dr. Perez acknowledged that Plaintiff had a lumbar disc disease at two levels, but stated that her physical examination was "completely normal." (Tr. 182.)

### 5.  Intermittent Emergency Room Reports From Manatee Memorial Hospital

While Plaintiff never sought routine medical care from a family care practitioner (Tr. 286), she visited the Manatee Memorial Hospital emergency room seven times between January of 2005 and December of 2006 (Tr. 20; 293).  The first of these visits was on January 3, 2005.[33] (Tr. 186.)  Plaintiff complained of chronic "sharp, aching 'pain'" that was "described as being moderate in degree and in the area of the left lower lumbar spine, left gluteus and right lower lumbar spine and radiating to the left buttocks and left knee."  (Id.)  During a physical examination, the physician found a moderate muscle spasm of the left posterior back and mild vertebral point tenderness over the mid and lower lumbar spine.  (Tr. 187.)  Plaintiff also had limited range of motion in the lumbar spine.  (Id.)  Nevertheless, there was no soft tissue tenderness or CVA[34] tenderness.  (Id.)

The clinical impression of Plaintiff's condition was that she had a chronic lumbar strain,

---

[33] The ALJ opinion states that the first visit was on January 13, 2005 instead of January 3, 2005.

[34] CVA is an "abbreviation for Cerebrovascular Accident."  MOSBY'S at 326.

acute left sided sciatica[35] and probable acute bronchitis.[36]  (Id.)  Her discharge instructions stated that she should not partake in strenuous activity until she felt better.  (Tr. 188.)  Plaintiff was given an assortment of prescription medications, including Lortab, Tussionex, Valium and Zithromax.  (Tr. 187.)  She was also instructed to see Dr. Asad Ali if she did not feel better in seven days.[37]  (Tr. 188.)  Plaintiff was eventually discharged in good and improved condition. (Tr. 187.)

Plaintiff visited the emergency room again on February 7, 2005.  (Tr. 190.)  She complained of sharp, aching, chronic back pain, that was similar to her past episodes.  (Id.)  The pain was once again described as "being moderate in degree and in the area of the right lower lumbar spine and right gluteus and radiating to the right buttocks and right thigh."  (Id.)  The physician discovered a moderate muscle spasm within the right posterior back during a physical examination.  (Tr. 191.)  This was consistent with Plaintiff's previous emergency room visit. (Tr. 187; 191.)  Plaintiff also continued to exhibit a limited range of motion.  (Tr. 191.)

 Plaintiff was instructed not to bend, stoop, or lift more than ten pounds until she was well.  (Id.)  She was prescribed Lortab, Medrol, and Valium, and was discharged in good and improving condition.  (Id.)  Additionally, Plaintiff was instructed to attend a follow-up session

---

[35] Sciatica refers to "an inflammation of the sciatic nerve, usually marked by pain and tenderness along the course of the nerve through the thigh and leg.  It may result in a wasting of the muscles of the lower leg."  MOSBY'S at 1543.

[36] Acute bronchitis "is characterized by a productive cough, fever, hypertrophy of mucus-secreting structures, and back pain."  MOSBY'S at 245.

[37] There is no evidence that Plaintiff ever saw Dr. Ali.

with Dr. Philip Tally within seven days regardless of whether she was feeling better.[38]  (Tr. 192.)

Plaintiff did not return to the Manatee Memorial Hospital emergency room again until January 9, 2006.[39]  (Tr. 194.)  She complained of back pain once again, but stated that this particular episode had been exacerbated by a bus ride from New Jersey to Florida.[40]  (Tr. 194, 294.)  She ranked the pain as nine on a scale from one to ten.  (Tr. 196.)  Doctors performed a "normal inspection" of Plaintiff's back.  (Tr. 195.)  The examination revealed soft tissue tenderness in the lower central lumbar area of the back.  (Id.)  This soft tissue tenderness was not considered to be moderate.[41]  (Id.)

Plaintiff was given a number of instructions to follow upon discharge.  (Id.)  Similar to her February 7, 2005 hospital visit, Plaintiff was told not to bend, stoop, or lift more than ten pounds.  (Id.)  In addition, she was told not to sit for a prolonged period of time for five days. (Id.)  Prior to being discharged, Plaintiff was prescribed Ibuprofen, Skelaxin and Panlor DC. (Id.)  She was also told to follow up with the East Manatee Family Healthcare Clinic within five days even if she was feeling well.[42]  (Id.)  Plaintiff ranked the pain as a two on a scale of one to

---

[38] There is no evidence that Plaintiff ever visited Dr. Tally.

[39] There is evidence that Plaintiff visited Manatee County Rural Health Services, Inc. for a risk assessment on June 13, 2005.  (Tr. 255.)  Manatee County Rural Health Services also has records of Plaintiff visiting them for comprehensive episodic care on August 4, 2005 (Tr. 245) and September 1, 2005 (Tr. 244).

[40] Plaintiff later testified that she could only sit without pain for fifteen to twenty minutes at a time.  (Tr. 288.)

[41] The report does not expound upon this description of the soft tissue tenderness.  (Tr. 195.)

[42] Plaintiff was advised of the need for patients to attend follow-up sessions.  (Tr. 195.)
(continued...)

ten at the time of her discharge.  (Tr. 197.)

A subsequent visit to the Manatee Memorial Hospital emergency room followed on January 31, 2006.  (Tr. 208-10.)  Plaintiff once again complained of back pain and pain in her leg.  (Tr. 209.)  Due to the pain, Plaintiff stated that she could not "straighten up."  (Id.)

Although the evaluating doctor once again instructed Plaintiff not to lift more than ten pounds (Tr. 210), this visit to the emergency room differed from Plaintiff's previous experiences. The Manatee Memorial Hospital report stated that the hospital could not continue to treat chronic back pain through the emergency room.  (Id.)  Plaintiff was informed that she would need to visit the East Manatee Clinic for further treatment on her back.  (Id.)

Plaintiff did not visit the East Manatee Clinic for further treatment.[43]  She did, however, return to the Manatee Memorial Hospital emergency room on April 24, 2006.  (Tr. 226.) Plaintiff again complained of back pain in the lower lumbar spine, right lumbar spine, and right S.I. joint.  (Tr. 229.)  She further stated that the pain radiated to the right buttocks, right thigh, right knee, and right calf.  (Id.)  While Plaintiff described the pain as moderate, the attending physician described the quality of the back pain to be dull.  (Id.)  A physical examination revealed soft tissue tenderness in the right lumbar area of Plaintiff's back.  (Tr. 230.)  The

---

[42](...continued)
The discharge instructions were reviewed with Plaintiff, who stated that she understood the instructions.  (Tr. 197.)  A written copy of the instructions was given to Plaintiff as well.  (Tr. 197.)  Nevertheless, there is no indication in the record that Plaintiff visited the East Manatee Family Healthcare Clinic.

[43] There is no evidence in the record verifying that Plaintiff attended the East Manatee Clinic.

clinical impression was acute right sided lumbar radiculopathy.[44] (Id.)

In contrast to the above findings, a separate physical assessment by a nurse stated that Plaintiff appeared to be in pain, and had a limping gait.  (Tr. 231.)  Furthermore, this assessment stated that Plaintiff had moderate soft tissue tenderness in the right lower lumbar paraspinous region.  (Id.)  This tissue tenderness radiated down Plaintiff's right leg, but did not cause Plaintiff to have any sort of abnormal range of motion.  (Id.)

Plaintiff was prescribed Flexeril and Nabumetone.  (Tr. 230.)  Prior to being discharged in good and stable condition, she was also instructed to follow up with Dr. James Tiesi even if she was well.[45]  (Id.)  Upon discharge, Plaintiff left the emergency department driving a private vehicle (Tr. 231), although she later testified that she does not drive because she does not have a driver's licence (Tr. 287-88).

Plaintiff visited the Manatee Memorial Hospital emergency room again on June 15, 2006.  (Tr. 214.)  Plaintiff complained of moderate back pain, but unlike previous visits to the emergency room, the June 15, 2006 visit followed an injury to Plaintiff.  (Tr. 217.)  The record reveals conflicting information regarding whether Plaintiff injured herself by lifting an object, or whether she twisted her back coming down the steps.[46]  (Tr. 219, 223)  Although Plaintiff described the pain as an eight on a scale from one to ten, a physical assessment of Plaintiff stated that she did not appear to be in acute distress. (Tr. 219.)

---

[44] Radiculopathy is "a disease involving a spinal nerve root."  MOSBY'S at 1459.

[45] There is no evidence that Plaintiff ever visited Dr. James Tiesi.

[46] Plaintiff's testimony states that she visited the hospital on this occasion because she "twisted" her back in a certain way.  (Tr. 293.)  She claims that she does not remember saying that she lifted anything at home.  (Tr. 293-94.)

A physical examination revealed mild soft tissue tenderness in the right lower and left lower lumbar areas.  (Tr. 218.)  The soft tissue tenderness also radiated to the right leg.  (Tr. 223.) Plaintiff was subsequently diagnosed with a lumbar region sprain to her back.[47]  (Tr. 214.) Plaintiff was instructed not to bend, stoop, or lift anything greater than ten pounds.  (Tr. 215.) She was also ordered  not to sit for a prolonged period of time.  (Id.)  She was prescribed Tylenol with Codeine #3 and Flexeril   (Id.)  Additionally, Plaintiff was instructed to make a follow up appointment with Dr. Vishal Sharma if she was not feeling better in five days.[48]  (Id.)  Upon discharge, Plaintiff described her level of pain to be zero on a scale from one to ten.  (Tr. 220, 224.)

Plaintiff's final emergency room visit occurred on December 27, 2006.  (Tr. 267.)  She once again complained of "sharp" back pain.  (Tr. 275.)  The pain originated in the lower lumbar spine and right SI joint, before radiating to the right buttocks and right thigh.  (Id.)  Although Plaintiff was found to have a painless range of motion (Tr. 276), a physical assessment stated that she appeared to be in pain (Tr. 278).  Plaintiff was instructed to soak the affected area in warm water three to six times a day for approximately fifteen to twenty minutes at a time.  (Tr. 276.) Additionally, she was told to limit lifting, not to partake in any strenuous activity, and to rest. (Id.)  Plaintiff was also prescribed Lortab, Toradol and Valium for her pain.  (Tr. 267.)

Plaintiff was discharged in stable condition.  (Tr. 276.)  She was told to follow up with

---

[47] While one page of the report (Tr. 214), states that Plaintiff has a lumbar "sprain," the following page (Tr. 215) states that she suffered from a lumbar "strain."

[48] There is no evidence in the record indicating that Plaintiff visited Dr. Sharma.

17

East Manatee Family Healthcare Clinic in three days, even if she was feeling well.[49]  (Tr. 277.)

Plaintiff described her pain level upon discharge as an eight out of ten.  (Tr. 278.)  Once again,

she was seen leaving the emergency room driving her own vehicle.  (Id.)

### 6. Examination by the Office of Disability Determination

After Plaintiff's first hearing before ALJ Ayer on July 31, 2006, she was evaluated by the

Office of Disability Determination.  (Tr. 232-38.)  Plaintiff was examined by Dr. J. Hirschman[50]

on October 31, 2006. (Tr. 232.)  Dr. Hirschman performed a fifteen to twenty minute

examination at the St. Patrick Medical PA in Brandon, Florida (Tr. 304.)

At the time of the examination, Plaintiff stated that her pain was "in the lower back right

hip and radiates down the RLE with paresthesia from sitting too long."  (Tr. 232.)  She described

the pain as being a seven on a scale of one to ten, although she explained that the pain was worse

when she was standing or bending down to put on her sneakers (Id.).  There were no signs of

high blood pressure.  (Id.)  Plaintiff was also not diagnosed with sleep apnea, despite allegedly

having trouble sleeping.  (Id.)  Similarly, she was not diagnosed with depression, although she

"gets down, cries and feels depressed often."  (Id.)

The results of the physical exam describe Plaintiff as generally having no pain or

---

[49] The record indicates that Plaintiff did follow up with the East Manatee Family
Healthcare Clinic on January 5, 2007.  (Tr. 250-54.)  The report acknowledged Plaintiff's back
pain and muscle weakness.  (Tr. 250.)  Plaintiff was prescribed certain medications and a
recommendation was made that Plaintiff undergo another MRI.  (Tr. 252.)  The results of that
MRI are not contained within the record.

[50] ALJ Ayer's opinion states that Dr. Ijewere examined Plaintiff on October 31, 2006.
(Tr. 21.)  While Dr. Ijewere was the head medical consultant, Dr. Hirschman actually examined
Plaintiff.  Moreover, this examination preceded Plaintiff's final visit to the Manatee Memorial
Hospital emergency room.  That visit took place on December 27, 2006.  (Tr. 267.)

discomfort while seated.  (Tr. 233.)  When walking, however, Plaintiff's gait was described as

abnormal.  (Tr. 235.)  More specifically, Plaintiff was reported to have a "mild, limp gait."  (Id.)

She performed a tandem walk, heel walk, and toe walk with mild difficulty.  (Tr. 235.)  Hopping

and squatting caused her moderate difficulty.  (Id.)  Plaintiff's posture was normal and upright.

(Id.)

  Dr. Hirschman's overall impression was that mild physical therapy would help Plaintiff's

back and neck.  (Id.)  Dr. Hirschman also recommended a psychological evaluation for Plaintiff's

mild to moderate depression.  (Id.)  There were no problems found with Plaintiff's range of

motion (Tr. 236-38), and overall, she could "use all extremities in moderate bending or lifting

task[s] seated or standing" (Tr. 235).  Dr. Hirschman recommended that Plaintiff change

positions every few hours to help as well.  (Id.)

  Dr. Hirschman also completed a report concerning Plaintiff's ability to do work related

activities.  (Tr. 239-41A.)  The report stated that Plaintiff should not lift more than twenty five

pounds occasionally or frequently.  (Tr. 239.)  Nevertheless, sitting, pushing or pulling, standing,

and walking were not affected by Plaintiff's impairment according to Dr. Hirschman.  (Tr. 240.)

  Plaintiff was deemed able to climb ramps, stairs, ladders, ropes, and scaffolds

frequently.[51]  (Id.)  She was also capable of balancing, kneeling, crouching, crawling and

stooping on a frequent basis.  (Id.)  Additionally, Plaintiff was not limited by her impairment

when she had to reach in all directions, handle large objects, or use her fingers to operate fine

objects.  (Tr. 241.)  She also had no trouble feeling.  (Id.)

---

[51] Frequently means occurring one-third to two-thirds of an eight hour workday.  (Tr. 240.)  The activity does not have to be continuous, but merely cumulative.  (Tr. 240.)

**7.  Testimony of Gerald Wili; Vocational Expert**

Gerald Wili is an impartial vocational expert, who testified at Plaintiff's hearing at the request of ALJ Ayer.  (Tr. 23.)  Mr. Wili testified that a hypothetical person who had the same limitations as Plaintiff would not be able to perform the type of work Plaintiff had performed in the past.  (Tr. 295.)  Nevertheless, Mr. Wili stated that such a person would be capable of performing other types of work.  (Id.)  He explained that Plaintiff was capable of working as a "cashier II."[52]  (Id.)  He defined a cashier II as the type of cashier "found in a restaurant or cafeteria or a parking lot or a garage or in a self service gas station where they would be mainly handling money and could sit or stand."  (Tr. 295-96.)  At the time of Plaintiff's July 31, 2006 hearing there were approximately 1,500 cashier II positions locally[53] (Tr. 23), 10,000 in the state of Florida (Tr. 296), and 200,000 nationally (id.).  A cashier II has a Specific Vocational Preparation[54] (SVP) rating of two.[55]  (Id.)

Mr. Wili continued to state that Plaintiff could alternatively find work as a toll collector.[56]  (Id.)  There are fewer toll collector positions available when compared to cashier II positions:

---

[52] The United States Department of Transportation (DOT) code for a cashier II is 211.462-010.  (Tr. 296.)

[53] "Locally" was defined as the "immediate two county area."  (Id.)

[54] Specific Vocational Preparation "is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES B-1 (U.S. Dep't of Labor ed., U.S. Gov't Printing Office 1998) (1993) [Hereinafter OCCUPATIONAL TITLES].

[55] An SVP rating of two refers to any type of training "beyond short demonstration up to and including [one] month."  OCCUPATIONAL TITLES, B-1.

[56] The DOT code for a toll worker is 211.462-038.  (Tr. 296.)

250 positions exist locally; 2,000 in the state of Florida; and 40,000 nationally.  (Id.)  A toll collector also has an SVP rating of two.  (Id.)

Finally, Mr. Wili stated that despite Plaintiff's limited condition, she could work as a produce sorter.[57]  (Id.)  There are approximately 2,700 produce sorters locally, 11,000 in the state of Florida, and 210,000 nationally.  (Id.)  A produce sorter also has an SVP of two.  (Tr. 23.)

None of the three jobs that Mr. Wili proposed require any climbing, balancing, kneeling, crouching, or crawling.  (Tr. 296-97.)  All three jobs could be completed either sitting or standing.[58]  (Tr. 297.)

## DISCUSSION

### A.   Standard of Review

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

---

[57] The DOT code for a produce sorter is 529.687-186.  (Tr. 296.)

[58] However, Mr. Wili explained that none of these three jobs address Plaintiff's alleged need to take hour long mid day naps. (Tr. 298.)

21

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom.

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir.

1984)).

        In the determination of whether there is substantial evidence to support the

Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2)

the diagnoses and expert opinions of treating and examining physicians on subsidiary questions

of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family

and neighbors; (4) the claimant's educational background, work history and present age."

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791,

793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision,

it is of no consequence that the record contains evidence which may also support a different

conclusion.  Blalock, 483 F.2d at 775.

**B.     Statutory Standards**

        The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. §

423(d)(5).  To qualify for Disability Insurance Benefits (DIB) or SSI benefits, a claimant must

first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is

deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

22

than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777

(3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he

"is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D.

Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not

enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a

disability if it "results from anatomical, physiological or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.

§ 423(d)(3).

## C.    The Five Step Evaluation Process and the Burden of Proof

Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.[59]  20 C.F.R.

§ 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not

"disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141

(1987).

At step two, the Commissioner must determine whether the claimant suffers from a

severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly

limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining

whether the claimant has a severe impairment, the age, education, and work experience of the

_____

[59] Substantial gainful activity is "work that involves doing significant and productive
physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[60] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.  (Id.)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the

---

[60] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, such as age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the jobs in the national economy that exist for particular combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S.

458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R.

Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the

cumulative effect of the claimant's impairments in determining whether she is capable of

performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

Moreover, "the combined impact of the impairments will be considered throughout the disability

determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F.

Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove

that the impairments in combination are severe enough to qualify him for benefits.  See Williams

v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show

how a combination-effects analysis would have resulted in a qualifying disability); see also

Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating

that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited

one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three

determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit

applies its procedural requirements, as well as their interpretation in Jones, to every step of the

decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at

every step, "the ALJ's decision must include sufficient evidence and analysis to allow for

meaningful judicial review," but need not "adhere to a particular format."  Id.

**D. Subjective Complaints of Pain**

An ALJ may not ignore a claimant's subjective complaints of pain when evaluating a

disability claim. Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986). Although there must be

26

objective medical evidence of a condition which could produce pain, objective evidence of pain itself is not required. Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984). The Third Circuit requires:

> (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain "may support a claim for disability benefits" and "may be disabling;" (3) that when such complaints are supported by medical evidence, they should be given great weight; (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted).  An individual's description of his or her pain or symptoms,  although relevant, is not conclusive in itself. 42 U.S.C. § 423(d)(5)(A); see 20 C.F.R. § 404.1529(b) (stating that symptoms alone "will not be found to affect [the claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present"); Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 956 (3d Cir. 2006).

**E.  Seven Part Test for Considering Pain**

According to Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529, 416.929, the seven factors used to evaluate a claimant's allegation of pain are (i) the extent of daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication; (v) treatment other than medication for the symptoms; (vi) measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.  Canales v. Barnhart, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

**F. Weight Accorded to Evidence**

The Secretary considers all submitted opinions to evaluate a claim for disability benefits. If the medical evidence presented is inconsistent, then the evidence will be weighed in order to reach a decision. See 20 C.F.R. § 404.1527.  The highest quantum weight is accorded to medical opinions of the treating physicians.  In reviewing a decision by the Secretary, "a court gives greater weight to the findings of a treating physician than to the findings of a physician who has examined a claimant only once or not at all."  Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404. 1527(d)(2).  When a treating physician's opinion is not "well supported" the length and frequency of treatment is considered.  The more frequently examined and closely followed a claimant has been, the greater weight his attending doctor's opinion will carry.  The more evidence produced in support of a medical opinion and consistency with the entire record, generally the greater the weight it will receive regardless of whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(3)-(5).

**G.  ALJ Ayer's Findings**

ALJ Ayer performed the five step evaluation and concluded that Plaintiff was not disabled, as defined in 20 C.F.R. § 404.1520.  (Tr. 15.)

*1.   Step One*

ALJ Ayer found that Plaintiff satisfied step one of the evaluation process because she "has not engaged in substantial gainful activity since May 12, 2004, the alleged onset date."  (Tr. 16.)

### 2.      Step Two

ALJ Ayer found that Plaintiff suffers from lumbar disc disease and obesity.  (Id.)  These

impairments qualified as severe under 20 C.F.R. §§ 404.1520(c) and 416.920(c).  (Id.)

### 3.      Step Three

ALJ Ayer found that Plaintiff's impairments did not meet or medically equal the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17.)

### 4.      Step Four

Based on the record, ALJ Ayer found that Plaintiff had "the residual functional capacity

to perform a limited range of light work activity."  (Id.)  ALJ Ayer made this decision because

Plaintiff had "the residual functional capacity to occasionally lift and carry twenty pounds, and

frequently lift and carry ten pounds."  (Id.)  Moreover, he stated that "she is able to stand and/or

walk about six hours in an eight hour workday, sit about six hours in an eight hour workday,

occasionally climb, balance, kneel, crouch, and crawl and never bend or stoop."  (Id.)  According

to ALJ Ayer, Plaintiff could work so long as she did not "have to drive or operate machinery"

and could "periodically alternate between sitting and standing, at will."  (Id.)

### 5.      Step Five

ALJ Ayer found that "[c]onsidering the claimant's age, education, work experience, and

residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform."  (Tr. 23.)  ALJ Ayer based this determination on the

testimony of Mr. Gerald Wili, a vocational expert.  (Tr. 24.)

## ANALYSIS

Plaintiff's sole contention is that ALJ Ayer's decision should be remanded because "[t]he

residual functional capacity (RFC) [assessment] formulated by the ALJ is not supported by

29

substantial evidence." (Br. in Support of Pl. Harriet Boyce 1 [hereinafter "Pl's Br."].) Plaintiff specifically asserts that ALJ Ayer's RFC assessment is unsubstantiated because it is based merely on the solitary findings of a consultive examiner at the Office of Disability Determination on October 31, 2006. (Pl's Br. 6-7.) As explained below, this assertion is unfounded since ALJ Ayer references numerous medical reports in support of his conclusion.

Plaintiff argues that the ALJ's RFC determination was not based on substantial evidence, including Plaintiff's medical history and radiology reports. (Pl's Br. 7.) Plaintiff contends that ALJ Ayer based his RFC assessment upon the findings of the consultive examiner at the Office of Disability Determination "although this source did not have access to the claimant's radiology reports and findings of numerous other examining physicians." (Pl's Br. 7.)

This argument is baseless and is not supported by the ALJ's opinion. ALJ Ayer determined that Plaintiff had the requisite RFC to perform a limited range of light work activity only "after careful consideration of the entire record." (Tr. 17.) Furthermore, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR [sic] [§§] 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 17-18.)

In support of these conclusions, ALJ Ayer's written decision details the progression of Plaintiff's alleged disability. (Tr. 17-22.) The opinion reflects consideration of the objective medical facts, medical opinions, and Plaintiff's subjective complaints, as well as her educational background, work history, and present age. (Tr. 18-24.)

Although Plaintiff argues that ALJ Ayer based his findings solely upon the Office of Disability Determination's October 31, 2006 examination, an evaluation of the ALJ's opinion reveals a specific analysis of medical facts and opinions that spans as far back as May 25, 2004.

(Tr. 19.)  For example, ALJ Ayer states that, on May 25, 2004, Plaintiff underwent lumbar x-ray and MRI studies.  (Id.)  He explained that the spine x-ray studies "confirmed mild degenerative changes and osteopenia, but [exhibited] no evidence of acute abnormality, fracture, or subluxation."  (Id.)  Similarly, the MRI studies "indicated 'only mild central canal stenosis.'" (Tr. 20.)  ALJ Ayer's findings were supported by the record.  (Tr. 164-65.)

Furthermore, ALJ Ayer relied upon the medical opinion and specific findings of Dr. Robert Proctor.  (Tr. 20.)  Additionally, the ALJ considered Plaintiff's testimony, and cited Plaintiff's emergency room visits.  (Id.)  ALJ Ayer specifically referenced six of Plaintiff's emergency room visits.[61]  (Id.)  The ALJ considered the treating physicians' medical opinions regarding Plaintiff's subjective level of distress at each of these evaluations.  (Tr. 20-21.)  Only after summarizing these facts, did ALJ Ayer refer to the report of the Office of Disability Determination.  (Tr. 21.)

On this record, this Court will not remand the ALJ's decision for lack of substantial evidence in making his RFC assessment.  This Court is "bound by the ALJ's findings of fact if they are supported by substantial evidence on the record."  Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  As previously stated, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401.  This Court can only determine whether substantial evidence exists to support the ALJ's decision after considering the totality of the evidence presented.  See Taybron, 667 F.2d at 413.  In doing so, this Court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of

---

[61]   These visits occurred on January 13, 2005; February 7, 2005; January 9, 2006; April 24, 2006; June 15, 2006; and December 27, 2006.

pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." <u>Blalock</u>, 483 F.2d at 776.

This Court finds that ALJ Ayer consistently referred to the full record throughout his opinion.  Any allegation that the ALJ only referred to the findings of the Office of Disability Determination is unfounded.  The ALJ's opinion is well substantiated because the record provides "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401.

## **<u>CONCLUSION</u>**

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence.  Therefore, this Court affirms the Commissioner's findings below.

Dated: March 31, 2009

     S/Joseph A. Greenaway, Jr.
    JOSEPH A. GREENAWAY, JR., U.S.D.J.